Jeffrey Peterson
6 Liberty Square, #340
Boston, MA 02109
Phone: (617) 500-4980
Fax: (617) 804-0441
Plaintiff Pro Se
E-mail: legal@jeffreypeterson.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY PETERSON,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>DENNIS K. BURKE, MARCO A. LOPEZ JR., LUIS BORBON HOLGUIN, VICTOR FLORES, LISA FLORES, MARIO E. DIAZ, JANE DOE DIAZ, SUZANNE BARR, DAVID LOPEZ, GANNETT CO., INC., PHOENIX NEWSPAPERS, INC. DBA ARIZONA REPUBLIC, CRAIG HARRIS, THE DEMOCRATIC NATIONAL COMMITTEE; JOHN AND JANE DOES 1-10; BLACK CORPORATIONS 1-10; WHITE ENTITIES 1-10,<br><br>　　　　　Defendants | Case No.:<br><br>COMPLAINT<br><br>JURY TRIAL REQUESTED |

Plaintiff Jeffrey Peterson, for his complaint in this matter, upon information and belief, alleges as follows:

1

## PRELIMINARY STATEMENT AND BACKGROUND

1.      This complaint seeks to remedy substantial harm to Plaintiff caused

by a lengthy, ongoing tortious campaign (the "Retaliatory Campaign") orchestrated

against Plaintiff by Defendant Dennis K. Burke (hereinafter referred to as

"BURKE") who was formerly the United States Attorney for the District of

Arizona under President Barack OBAMA (hereinafter referred to as "44"), and

Attorney General Eric HOLDER[1] (hereinafter referred to as "A.G. Holder")

together with certain of Plaintiff's former business and political colleagues,

including several whom are known for participating in social and political group

related to former United States Homeland Security Secretary Janet NAPOLITANO

(hereinafter referred to as "JN"), a group characterized by the *Arizona Capitol*

*Times* newspaper as the "Arizona Mafia",[2] including but not limited to Defendants

Marco A. Lopez Jr. ("Lopez Jr."), Victor Flores ("Flores"), Mario E. Diaz

("Diaz"), Suzanne Barr ("Barr") and Luis Borbon Holguin ("Borbon")

(collectively, the "Group of Former Colleagues" and "the AZM Defendants"),

certain members of whom are affiliated directly or indirectly with Defendant the

Democratic National Committee (hereinafter referred to as "the DNC").

---

[1] Background is provided about former U.S. Attorney Dennis BURKE's historical political relationships and professional activities as Plaintiff's history with key members of the United States Democratic Party are included amongst material facts that form the basis of this Complaint.

[2] "Napolitano's years at Homeland Security pay dividends for 'Arizona Mafia'", Arizona Capitol Times, by Jeremy Duda, July 19, 2013. "Being part of the massive entourage that Janet Napolitano brought with her from Arizona to the Beltway has been a great career move for some of her loyalists."

2.     Defendant BURKE, characterized within this Complaint as the group leader of the Retaliatory Campaign, was formerly employed by the United States Department of Justice ("DOJ") as the United States Attorney for Arizona under A.G. Holder, appointed by 44.

3.     BURKE quit his post as United States Attorney after tendering his letter of resignation to 44 in August of 2011 amid the wake of a weapons trafficking scandal known as the ATF gunwalking scandal[3] (hereinafter referred to as "Fast and Furious").

4.     In Fast and Furious, weapons were allegedly trafficked by agencies of the United States Government to drug cartels in Mexico.[4] In June of 2012, in testimony before a United States House of Representatives committee, A.G. Holder was questioned why the Fast and Furious weapons trafficking had occurred, to which A.G. Holder answered, "Frankly, I don't know."

5.     In connection with the Fast and Furious scandal, Deputy Attorney

---

[3] Background is provided about former U.S. Attorney Dennis Burke's previous political scandal, as it is an essential part of Plaintiff's story. This background is necessary to explain events leading up to problems that ensued between BURKE and Plaintiff Jeffrey Peterson throughout their business, social and political relationship that lasted more than ten years, starting approximately 2003 through present day.

[4] See: "Judge rules against Obama on 'Fast and Furious'", thehill.com, by Harper Neidig, 01/19/16 02:05 PM EST. Retrieved December 10, 2018. "U.S. District Court Judge Amy Berman Jackson ordered the administration to release documents that it has been attempting to withhold by asserting executive privilege.

Operation Fast and Furious was launched by the Bureau of Alcohol, Tobacco, Firearms and Explosives.

The gun-running operation, which lasted from 2009 to 2011, resulted in the ATF losing over a thousand firearms ... [t]wo of those weapons were linked to the 2010 murder of a Border Patrol agent in Arizona ... Many of the weapons are suspected to have landed in the hands of Mexican drug cartels."

3

General James Cole chastised BURKE for "lying....and for leaking."[5] BURKE was subsequently censured and fined by the Arizona Bar for misconduct in March of 2014.[6]

6.     Previously, BURKE served interests of 44 and the DNC on the Obama-Biden Transition Team.

7.     Previously, BURKE served as Senior Policy Analyst for the White House Domestic Policy Council during the administration of President William Jefferson CLINTON (hereinafter referred to as "42").[7]

8.     Subsequent to BURKE's resignation as a DOJ federal prosecutor under 44 and A.G. Holder, due to the Fast and Furious scandal in which weapons were trafficked to Mexican drug cartels,[8] BURKE began working with Lopez Jr.,

---

[5] See: "Report faults former U.S. Attorney Dennis Burke for Fast and Furious leak", politico.com, by Josh Gerstein 05/20/2013 01:28 PM EDT. "The report says Deputy Attorney General James Cole concluded, a couple of months before Burke's resignation, that Burke had lied to him. Cole said he chastised Burke for "lying....and for leaking."

Burke declined to speak with the IG's investigators, who could not compel him to do so because he no longer works for the government.

"Mr. Burke's refusal to cooperate with the Inspector General's investigation shows me that he didn't operate in good faith. His actions are indicative of this administration's willingness to attack whistleblowers who cooperate with Congress and show the administration's commitment to undermine legitimate congressional oversight," Grassley said in a statement.

[6] See: Agreement for Discipline by Consent: Burke, Dennis; Bar # 012076, Arizona Judicial Branch, reference no. PDJ-2014-9028, March 27, 2014. In connection with the disciplinary proceedings, BURKE admitted to violating the "Integrity of the Profession", in a Attorney violation involving "dishonesty, fraud, deceit or misrepresentation;" Rule 42, Ariz. R. Sup. Ct., specifically ERs 1.6 and 8.4(c).

[7] Defendant BURKE, during his lengthy career serving interests of the United States Democratic Party, was employed as a Senior Policy Analyst for the White House Domestic Policy Council during the Clinton administration. Source: ballardspahr.com, Attorney Profile for Dennis K. Burke. Retrieved December 10, 2018.

[8] See: "Judge rules against Obama on 'Fast and Furious'", thehill.com, by Harper Neidig, 01/19/16 02:05 PM EST. Retrieved December 10, 2018. "The gun-running operation, which lasted from 2009 to 2011,

4

who now serves as a consultant to a members of the controversial[9] Salinas political

family of Mexico, led by a former President of Mexico, Carlos Salinas de Gortari

("CSG").[10]

9.      This Complaint is about a Retaliatory Campaign, undertaken by

BURKE and others in an effort to silence and harm Plaintiff, who has significant

knowledge about BURKE and others within his Group of Former Colleagues, due

to business, personal and political relationships Plaintiff previously maintained

with parties specified throughout this Complaint during a time period of more than

ten years.

10.     The Retaliatory Campaign was conceptualized by BURKE and has

been carried out by BURKE and certain members of Plaintiff's Group of Former

---

resulted in the ATF losing over a thousand firearms ... Many of the weapons are suspected to have landed in the
hands of Mexican drug cartels."

[9] See: "Family Tree - Carlos Salinas | Murder Money & Mexico", pbs.org, FRONTLINE.
Retrieved December 10, 2018. "Carlos Salinas de Gortari was president of Mexico from 1988 to December 1994.
He was the ruling PRI's candidate in the election and many believe he won through fraud. Currently living in self-
imposed exile in Ireland, he left Mexico fearing he might be charged with the murder of his chosen successor Luis
Donaldo Colosio.

Carlos [Salinas] is extremely unpopular in Mexico where he is blamed for a decreased standard of
living, economic difficulties, the rise of the drug trade and the massive corruption that occurred during his
administration. While some credit Salinas with important reforms and beginning privatization, many Mexicans
blame NAFTA - passed under Salinas - for Mexico's economic problems."

[10] See: "Family Tree - Carlos Salinas | Murder Money & Mexico", pbs.org, FRONTLINE.
Retrieved December 10, 2018. "... [regarding] U.S. Justice Department witness testimony in its lawsuit against
Mario Ruiz Massieu. The witnesses implicate ex-president Carlos Salinas de Gortari, his siblings Adriana and Raul,
his father Raul Salinas Lozano, and his ex-brother-in-law Jose Francisco Ruiz Massieu in drug trafficking
operations. Includes documents/notes on witnesses testimony.

...In the version advanced by the Justice Department, the more than nine million dollars seized
from Mario Ruiz Massieu's account at the Houston Commerce Bank are proceeds from the sale of drugs to be
laundered by Mario Ruiz Massieu on behalf of Jose Francisco Ruiz Massieu."

Colleagues and other persons since 2014 when, among other things, a long-standing professional relationship and friendship deteriorated between BURKE, Plaintiff, certain members of the Plaintiff's Group of Former Colleagues and other persons due to reasons explained throughout this Complaint. On information and belief, the Retaliatory Campaign continues against Plaintiff at present day.

11.     Throughout the Retaliatory Campaign, BURKE has, through his own efforts and by leading others, engaged in acts and caused defamatory statements to be made with intent to, among other things, permanently damage the reputation, credibility and viability of Plaintiff, a well-known technology entrepreneur who is the founder of the first Social Network to trade on a national stock exchange in the United States.[11]

12.     In furtherance of the Retaliatory Campaign, among other acts, one or more defamatory news articles meant to improperly cause harm to Plaintiff were intentionally orchestrated by BURKE as the group leader, written by Defendant

---

[11] Plaintiff Jeffrey Peterson was the original founder of the first nationally branded Hispanic Social Network in the United States, Quepasa Corporation, in 1998. See: "Quepasa", wikipedia.org. "In 2010 and 2011, several media publications reported that Quepasa was the "only publicly traded social network"[20][21] meaning Quepasa was the only Social Network trading on a Stock Exchange at that time.

Later in 2011, an article claimed that following its Initial Public Offering on May 4, 2011, Renren became the first publicly-traded social network.[22] Yet at the time of RenRen's IPO, Quepasa was already a well known publicly traded company with over 30 million[2] users on its social network that had been operating since at least 2006.[23]

This is especially noteworthy as the Initial Public Offering for the best known Social Network in history, Facebook, was Friday, May 18, 2012, a year after RenRen's IPO. If these historical dates prove correct, Quepasa may have been the first Social Network to go public and trade on a Stock Exchange in history."

Harris and published by the *Arizona Republic* newspaper and the azcentral.com website with knowledge of falsehood; therefore, inter alia, this Complaint seeks to remedy defamatory statements that were made with *actual malice.*[12]

**BURKE and Plaintiff's Former Group of Colleagues want to destroy Plaintiff's Character in order to conceal the truth about certain activities; in the Retaliatory Campaign, the specified group acted in concert**

13.    Throughout the Retaliatory Campaign, BURKE has intended to permanently damage Plaintiff's reputation, credibility and viability in order to further BURKE's own interests and the interests of certain members of Plaintiff's Former Group of Colleagues. Recognizing a years-long friendship and business relationship between himself and/or certain members of Plaintiff's Former Group of Colleagues and Plaintiff was deteriorating, BURKE orchestrated and continues to orchestrate the Retaliatory Campaign against Plaintiff because BURKE was concerned and continues to be concerned that Plaintiff may publicly disclose, among other things, the following non-privileged, true facts:

(a) That BURKE and Lopez Jr. were engaged in *significant* business, political and personal relationships with members of the controversial[13] Salinas

---

[12] Although the legal concept of actual malice may be recognized differently by Massachusetts law than the laws of other states, it is an important component of Plaintiff's case, therefore, the distinction is made throughout this Complaint.

[13] See: "The 10 Most Corrupt Mexicans Of 2013", Forbes Magazine by Dolia Estevez, Dec 16, 2013, 02:40pm. "In the group's Global Corruption Barometer of 2013, Mexico's political parties, police, legislature and judiciary were perceived as the most corrupt, with 91%, 90%, 83% and 80% negative views on corruption ... In Mexico corruption cases are rarely prosecuted.

political family of Mexico, (hereinafter referred to as the "Salinas Parties") led by Carlos Salinas de Gortari, a former President of Mexico ("CSG");

(b) That BURKE and Lopez Jr. have earned significant revenue by serving as connectors between the Mexican PRI political party (hereinafter referred to as "the Mexico-PRI"), the Salinas Parties and senior political figures in the United States, including political figures associated with the United States Democratic Party and the DNC;

(c) That BURKE had previously made numerous statements, including possible admissions of misconduct and/or culpability to Plaintiff, while Plaintiff and BURKE were friends, regarding BURKE's involvement in the Obama-era Fast and Furious arms trafficking scandal;

(d) That Defendants BURKE, Lopez Jr. and Plaintiff had previously discussed the same; and

(e) At the time the December 14, 2017 Arizona Republic news article was conceptualized and published, Defendant BURKE knew he would be providing professional services in connection with a criminal case of high value to persons associated with BURKE, Lopez Jr., the DNC and persons associated with the

---

…(continued) Raúl Salinas de Gortari is largely responsible for destroying his brother Carlos Salinas de Gortari's presidential legacy by becoming a symbol of corruption and impunity. Raúl spent ten years in jail convicted of a high-profile political homicide, but was acquitted in 2005. In July, a Mexican judge exonerated him on the final charge pending against him of "unlawful enrichment" and ordered $19 million dollars deposited in twelve bank accounts and 41 properties be returned to him. The decision outraged Mexicans. It was perceived as one more proof of abuse of power by Mexican elites."

Mexican PRI political party, known as the "NXIVM Cult" scandal, a Racketeer Influenced and Corrupt Organizations Act (RICO) case currently pending in the United States District Court for the Eastern District of New York[14] (hereinafter referred to as the "NXIVM Case"). The Retaliatory Campaign was intended by BURKE, among other considerations, to destroy Plaintiff's relationships with former mutual friends and business contacts of Plaintiff and BURKE in the legal, professional and social communities in Arizona, Washington, D.C., online, internationally, and in other venues, as BURKE has attempted to conceal his involvement with the NXIVM Case from public view. BURKE, mindful of the possibility Plaintiff would likely be an outspoken critic of BURKE's defense and advocacy of various parties in connection with the NXIVM Case, hopes to limit Plaintiff's ability to have a credible voice regarding BURKE's involvement in the NXIVM Case; and

(f) That Lopez Jr., who is a close business associate of BURKE, has, for many years, been planning to eventually run for public office in his own political campaign with the objective of becoming Governor of Arizona.[15] Plaintiff, due to his many years of friendship with BURKE, Lopez Jr., and significant political and

---

[14] USA v. Keith Raniere, aka "The Vanguard", Case no. 1:2018-cr-00204, Criminal Docket No. 18-204 (S-1) (NGG) (VMS), filed 04/19/2018, E.D.N.Y. Retrieved via PACER on 12/10/2018.

[15] See: "Ex-'boy mayor' of Nogales takes vital border slot" Arizona Daily Star newspaper, by Carmen Duarte, Mar 2, 2009. "Before I hit 40, I want to be governor of Arizona," said López."

business personalities in both the United States and Mexico, is familiar with the

intricacies of such arrangements, namely how such a future political campaign may

be strongly influenced by BURKE and Lopez Jr.'s growing connections to the

Mexico-PRI political apparatus. Amongst other considerations, one of the

fundamental reasons Defendant BURKE has orchestrated the Retaliatory

Campaign against Plaintiff, is with intent to improperly impair Plaintiff's ability to

have a public voice with respect to the facts and circumstances captioned by this

sub-paragraph (f).

### Improper Retaliatory Campaign activities

14.    In furtherance of the Retaliatory Campaign against Plaintiff,

Defendant BURKE and certain members of Plaintiff's Group of Former

Colleagues have engaged in, among other acts, the following improper activities

while intending to harm Plaintiff:

(a) Defendant BURKE knowingly reported facts he knew were false, to a

State Government agency, the Arizona Corporation Commission (hereinafter

referred to as the "ACC"), a regulatory agency in which the former Commissioner

was investigated by the FBI and indicted in May of 2017,[16] accused of taking

---

[16] See: " Ex-AZ Corp. Commissioner ... indicted on bribery charges." azfamily.com. By Morgan
Loew and Derek Staahl, May 25, 2017. " Former Arizona Corporation Commission member Gary Pierce is accused
of soliciting roughly $400,000 in cash and property ...

The indictment states that Pierce "knowingly and willfully, solicited, accepted and agreed to
accept money, ultimately totaling $31,500, and solicited real property valued at approximately $350,000, from

bribes[17]; and possibly to other Government agencies. BURKE's knowingly false reports to the Government caused at least one investigation pertaining to Defendant, certain of Defendant's business colleagues and Plaintiff's business interests. Such investigation(s) have caused significant disruption and emotional distress in Plaintiff's personal life and have harmed Plaintiff's business interests.

(b) Among other acts, Defendant BURKE, working together with Defendant Harris, orchestrated a defamatory, inaccurate news article published by the Arizona Republic newspaper on December 14, 2017,[18] (hereinafter referred to as "the December 14 Article") which included factually incorrect, defamatory statements made by BURKE and certain members of Plaintiff's Group of Former Colleagues with actual malice. The December 14 Article has caused significant disruption and emotional distress in Plaintiff's personal life and has harmed Plaintiff's reputation and business interests.

(c) Defendants, during a period of time reaching back as far as the year 2014, have, upon information and belief, made numerous defamatory statements to members of the domestic and international business community, to the media, and to mutual colleagues, among others, such as the repeated statement Plaintiff was

---

defendant JAMES FRANKLIN NORTON, a retained lobbyist ... knowingly and willfully, solicited, accepted and agreed to accept money"

[17] on July 17, 2018, it was reported U.S. District Court Judge John Tuchi had declared a mistrial with respect to this legal matter.
[18] See: " Ex-Quepasa head Jeff Peterson faces questions about investors' money", Arizona Republic newspaper, by Craig Harris, 12/14/2017. Attached to this Complaint as Exhibit A

11

"under investigation" without disclosing that Defendants themselves had improperly caused the investigation; that funds were allegedly improperly allocated between certain business entities by Plaintiff, when in fact Defendants BURKE and Lopez Jr. authorized such payments themselves with their respective Board of Directors votes taken at a duly authorized Board meeting while both Defendants BURKE and Lopez Jr. served on the Board of Directors of the subject company and BURKE served as head of the compliance committee of the subject company.

(d) Defendant BURKE and certain members of Plaintiff's Former Group of Colleagues have repeatedly invoked "law enforcement" vernacular while communicating with numerous parties to the detriment of Plaintiff, repeatedly stating, for example, that Plaintiff had "fled," one of many mischaracterizations spread by BURKE throughout the Retaliatory Campaign with intent to create the appearance Plaintiff was somehow involved in a "criminal" matter and to otherwise paint Plaintiff as a "criminal."

(e) Such improper disparagement of Plaintiff has been done throughout the Retaliatory Campaign with hopes to destroy the reputation, character and credibility of Plaintiff, as part of BURKE's hope to "criminalize" Plaintiff, ultimately to scare parties away from doing business with, or engaging in any way with Plaintiff.

12

(f)  Defendant BURKE, through his lengthy Retaliatory Campaign against Plaintiff, acting in concert with certain members of the Plaintiff's Group of Former Colleagues, has intentionally engaged in improper acts and has intentionally made improper statements meant to destroy the viability of Plaintiff as an entrepreneur and ultimately with the goal of destroying Plaintiff's life.

### Motivating factors behind the Retaliatory Campaign

(g) *for the Enrichment of BURKE and others;* The improper actions have been undertaken by Defendant BURKE, certain members of the Plaintiff's Group of Former Colleagues and other persons, throughout the Retaliatory Campaign, to advance the current and future economic and business interests, and political prospects of BURKE, Lopez Jr., and other persons.

(h) *to aid BURKE's agenda of concealing the Truth;* The improper actions have been undertaken by Defendant BURKE, certain members of the Plaintiff's Group of Former Colleagues and other persons, throughout the Retaliatory Campaign, to help conceal current and historical acts of BURKE, Lopez Jr., and other persons, certain which are allegedly affiliated with 42, the DNC, and/or the NXIVM Case, a RICO criminal prosecution involving human trafficking and money laundering, currently pending in the United States District Court for the Eastern District of New York, described above in paragraph 13 (e) of this Complaint.

13

## Repeated attempts to "Criminalize" Plaintiff

15.     Throughout the Retaliatory Campaign, BURKE, who was formerly a Government Prosecutor with the DOJ and the State of Arizona,[19] has, utilizing his knowledge of law enforcement procedures and relationships with Government employees, improperly attempted to influence a Government agency or agencies to investigate Plaintiff, Plaintiff's business colleagues and/or Plaintiff's principal business, regarding alleged violations of laws that Defendant BURKE knew never occurred and were based on false accusations, half-truths and innuendo, in a desperate and misguided effort to forcibly and improperly engage Plaintiff with the criminal justice system, in any way possible to the detriment of Plaintiff.

16.     Throughout the Retaliatory Campaign, BURKE, who was formerly a Government Prosecutor with the DOJ and the State of Arizona, has, utilizing his knowledge of law enforcement procedures, improperly attempted to influence a Government agency or agencies to charge Plaintiff, his business colleagues and/or his business, with alleged violations of criminal laws that Defendant BURKE knew never occurred were based on false accusations, half-truths and innuendo, in a desperate and misguided effort to have Plaintiff charged as a "criminal," in any

---

[19] Defendant BURKE, amongst other positions with Government agencies, was employed previously by the office of Arizona Attorney General as a prosecutor, under Attorney General Janet NAPOLITANO, from 1999 to 2002. Source: ballardspahr.com, Attorney Profile for Dennis K. Burke. Retrieved December 10, 2018. "[BURKE] served for four years at the Arizona Attorney General's office, primarily as the Chief Deputy Attorney General."

14

way possible.

17.     As of the date of filing this Complaint, despite the desperate efforts of

BURKE to brand Plaintiff as a "criminal" through the Retaliatory Campaign,

Plaintiff has never been charged with a criminal violation, other than minor traffic

violations, in any American state, territory, or for that matter, in any country, in his

entire life.

18.     This Complaint states claims for Defamation (Count One), Intentional

infliction of Emotional Distress (Count Two), Tortious Interference (Count Three),

Tortious Interference with Business Relations, (Count Four), Retaliation (Count

Five), Breach of Fiduciary Duty (Count Six), Civil Conspiracy (Count Seven),

Multiple Damages (Count Eight), Punitive Damages (Count Nine).

## THE PARTIES

19.     Plaintiff Jeffrey Peterson, an individual, is a resident of the

Commonwealth of Massachusetts for tax purposes in the United States. Plaintiff is

an American Citizen who is also a legal resident in the Greater Toronto Area

("GTA") of Ontario, Canada.[20]

20.     Defendant Dennis K. BURKE ("BURKE") is a resident of the State of

Arizona. On information and belief, BURKE conducts business in Arizona,

---

[20] At present, Plaintiff is registered as a "United States Citizen living Abroad" with the United States Consulate General in Toronto, Canada.

15

Washington D.C., and Mexico. BURKE is an attorney licensed to practice law in Arizona with Bar. No. 012076.

21.     Defendant Marco A. Lopez, Jr. ("Lopez Jr.") is a resident of the State of Arizona. Lopez is the Senior Advisor to Mexican billionaire Carlos Slim and is a consultant to the Salinas political family of Mexico, led by former Mexican President, Carlos Salinas de Gortari. On information and belief, Lopez Jr. conducts business throughout the United States, Mexico, and other international venues.

22.     Upon information and belief, Defendant Luis Borbon Holguin ("Borbon") is a citizen of Mexico who resides in the State of Arizona and conducts business activities in Arizona, Mexico, and Massachusetts.

23.     Upon information and belief, Defendant Victor Flores ("Flores") resides in the State of Arizona and conducts business activities in Arizona and Mexico.

24.     Defendant Lisa Flores ("Judge Flores") resides in the State of Arizona and is the spouse of Defendant Victor Flores. Judge Flores is Superior Court Judge in Maricopa County, Arizona appointed by Arizona Governor Janet Napolitano. Judge Flores is named in this Complaint solely because it is required to obtain jurisdiction over the marital community of Victor Flores.

25.     Defendant Mario E. Diaz ("Diaz") resides in the State of Arizona and conducts business throughout the United States. On information and belief, Diaz

16

maintains a significant contractual relationship with the United States Army.

26.     Defendant Jane Doe Diaz resides in the State of Arizona and is believed to be the spouse of Defendant Mario E. Diaz. Jane Doe Diaz is a fictitiously named Defendant who, together with the named Defendants, may be wholly or partially responsible for liability inducing conduct toward the Plaintiff. If and when the true name of this Defendant and the extent of their involvement with regard to the facts that form the basis of this Complaint become apparent, this Complaint will either be amended, or the Plaintiff will seek leave to amend the Complaint with this Court.

27.     Defendant Suzanne Barr ("Barr") is a resident of the Washington D.C. area who conducts business in the Washington, D.C. area and Massachusetts.

28.     Defendant David Lopez ("Lopez") is a resident of California who conducts business throughout the United States and internationally, on behalf of his daughter, Latin musician and movie actress, Jennifer Lopez.

29.     Upon information and belief, Defendant Gannett Co., Inc., is a Delaware Corporation publishing a well-known website, azcentral.com, accessible throughout the United States and worldwide.

30.     Upon information and belief, Phoenix Newspapers, Inc. dba Arizona Republic is an Arizona Corporation publishing a well-known newspaper, the *Arizona Republic*, available in print and online.

17

31.     Craig Harris ("Harris") is a journalist employed by the *Arizona Republic* newspaper. Articles published by Harris, including the December 14 article, were published to the website azcentral.com. Upon information and belief, Harris is a resident of the State of Arizona.

32.     Defendant the Democratic National Committee is a national committee, as that term is defined and used by 52 U.S.C. §30101, dedicated to electing local, state, and national candidates of the Democratic Party to public office throughout the United States. The DNC has members and constituents across the United States, including voters in Arizona. According to public documents, "the DNC works closely with Democratic public officials and assists state parties and candidates by contributing money; making expenditures for their benefit; and providing active support through the development of programs benefiting Democratic candidates."

33.     John and Jane Does 1 - 100, Red and Black Corporations 1 - 100, and White entities 1 - 100 are fictitiously named Defendants who, together with the named Defendants, may be wholly or partially responsible for liability inducing conduct toward the Plaintiff. If and when the true names of these Defendants and the extent of their involvement with regard to the facts that form the basis of this Complaint become apparent, this Complaint will either be amended, or the Plaintiff will seek leave to amend the Complaint with this Court.

18

## JURISDICTION AND VENUE

34.     Pursuant to 28 USC § 1332, this court has jurisdiction over Plaintiff's claims based on the diversity of citizenship of the parties and because the amount in controversy exceeds $75,000.

35.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and in this division, either in person or by virtue of electronic communications and/or other actions of the parties.

## FACTS APPLICABLE TO ALL COUNTS

36.     Plaintiff is a well-known technology entrepreneur. During the late 1990's, during the era of the .com technology boom in the United States, Plaintiff was founder and CEO of the first online community for U.S. Hispanics, Quepasa.com, Inc. ("Quepasa") Quepasa became a national sensation after a widely publicized Initial Public Offering of stock shares on the Nasdaq Stock Market at a market value of over $200 million in June of 1999, reaching a peak market value of approximately $500 million thereafter.

37.     Quepasa maintains its place in history as one of the top bilingual English/Spanish internet brands in history and as the first Social Network to trade publicly on a national stock exchange in the United States. The business founded by Plaintiff, Quepasa, was endorsed by and did business with national and

19

international celebrities, including Grammy-award winning singer Gloria Estefan and actress Jennifer Lopez, who is the daughter of Defendant David Lopez.

38.     Plaintiff's original Quepasa business still exists today, although it operates with a different name subsequent to a takeover transaction led by Florida businessman and politician Richard L. Scott in 2006 and a corporate name change to MeetMe, Inc. in the year 2012 and "The Meet Group" in 2017.

39.     Quepasa's new corporate name is the Meet Group, traded on the Nasdaq Stock Market with symbol MEET and a current market value of approximately $300 million.

## Peterson establishes a friendship with key Democrats; Arizona Democrats back an Illinois Senator in his bid for President

40.     As the founder of Arizona's first well-known Hispanic-themed ".com" internet company to go public on a national stock exchange, Plaintiff befriended JN during the time period of 1999-2003. JN was formerly Attorney General of the state where Plaintiff resided at the time, Arizona.

41.     Plaintiff advocated for JN's State Gubernatorial campaign in 2003.

42.     When JN won the 2003 election and became Governor of Arizona, JN appointed Plaintiff to the Board of Directors of the Arizona-Mexico Commission ("AMC"), an Office of Governor in which JN served as Chairman.

43.     Subsequent to Plaintiff's 2003 appointment to the Board of Directors of the AMC, Plaintiff was introduced to JN's trusted circle of friends, political

supporters and colleagues, including Defendants BURKE, Flores, Lopez Jr. and Barr.

44.     During the years 2003 - 2008 Plaintiff interacted frequently with numerous personalities from JN's trusted political and social circles, in a professional and social capacity.

45.     During the years captioned above, Plaintiff interacted frequently with senior members of the Arizona Democratic Party.

46.     During the years captioned above, Plaintiff interacted frequently with senior members of the United States Democratic Party including certain political figures within the DNC, including former DNC Chairman Howard Dean (hereinafter "Governor Dean").

47.     On Feb. 8, 2007, Plaintiff travelled with BURKE, certain members of the Former Group of Colleagues to Mexico City. (the "2007 Mexico City Trip")

48.     One of the invited guests on the 2007 Mexico City Trip was John Zidich ("Zidich"), who was, at the time, chief executive of Republic Media and publisher of The *Arizona Republic* and West Group president.[21]

---

[21] See: "NAU's Haeger joins governor to meet with Mexico president." NAU News, February 5, 2007. "members of Gov. Janet Napolitano's delegation ... will meet with Mexican President Felipe
Calderon this week in Mexico City ... Haeger will travel to Mexico City Feb. 8, 9 and 10 to participate in discussions about university relations and student exchanges.

In addition to Napolitano and Haeger, the Arizona delegation includes Ben Campbell, chairman and CEO of JP Morgan Chase Arizona ... and John Zidich, president and publisher of The Arizona Republic."

49.     Zidich later became domestic publishing head for Defendant Gannett Co. Inc.[22]

50.     During the 2008 Mexico City Trip, BURKE observed to Plaintiff, "We [parties associated with JN] have [John] Zidich in our pocket. *(sic)* The Arizona Public will print *whatever we tell them to.*"

51.     Plaintiff did not think much of BURKE's statements about the Arizona Republic newspaper, at the time.

52.     While Plaintiff was involved with JN's circle of trusted political and social circles, JN undertook significant steps to back a Senator from Illinois, referred to throughout this Complaint as "44," in his bid for President of the United States.

53.     In August of 2008, Plaintiff flew with, JN, Defendant BURKE, Defendant Lopez Jr. (who served JN as Director of the AMC at the time), and other parties, on a private aircraft, from Phoenix, Arizona, to Denver Colorado to attend the Democratic National Convention. The private aircraft was paid for by Plaintiff's corporation, Inter123 Corporation ("Inter123").

54.     On information and belief, the trip from Phoenix to Denver to attend

---

[22] See: "Gannett domestic publishing head John Zidich to retire in April 2018", usatoday.com by Mike Snider. Published 7:00 a.m. ET Nov. 2, 2017. "Zidich said Thursday he plans to retire April 3, 2018, as president of domestic publishing and publisher of USA TODAY. Zidich's role at Gannett has involved oversight of the company's 109 local media properties and USA TODAY...

    Before moving into his current role in 2015, Zidich was chief executive of Republic Media and publisher of The Arizona Republic and West Group president."

the Democratic National Convention was approved by Defendants BURKE and Lopez Jr., who served respectively as Chief of Staff and Senior Adviser to JN at the time.

55.     At the 2008 Democratic National Convention, 44 was nominated by his former opponent, Hillary Rodham Clinton (hereinafter, "HRC"), to be the next Democratic candidate for the Presidency of the United States.

### the Senator becomes President; JN appointed DHS Secretary; Plaintiff's friends appointed to Senior Positions in the Federal Government

56.     On November 4, 2008, 44 was elected President of the United States.

57.     Subsequent to the election of 44, due to JN's significant relationship with 44, Defendant BURKE became a member of the Obama Transition Team.

58.     On December 1, 2008, 44 named JN as his nominee for Homeland Security Secretary.

59.     In March of 2009, Defendant Lopez Jr. was named Chief of Staff of United States Customs and Border Protection (CBP).

60.     Also, in 2009, Defendant Barr was named Chief of Staff of U.S. Immigration and Customs Enforcement (ICE).

61.     On July 10, 2009, Defendant BURKE was nominated by 44 as the United States Attorney for the District of Arizona.

### The Fast and Furious Scandal; Other Scandals, Resignations. Secretary Napolitano Resigns as Homeland Security Secretary

62.     On August 30, 2011, in connection with the Fast and Furious arms trafficking scandal under 44 and A.G. Holder, Defendant BURKE resigned his position as United States Attorney for the District of Arizona.

63.     Also, in 2011, Defendant Lopez Jr. resigned his position as Chief of Staff of U.S. Customs and Border Protection (CBP).

64.     In August of 2012, Defendant Barr resigned as Chief of Staff of U.S. Immigration and Customs Enforcement (ICE) amid allegations of improper conduct. In a lawsuit, Defendant Barr was accused of inappropriate conduct during a trip made while acting in her official Government capacity in Bogota, Colombia.

65.     In July of 2013, JN announced her resignation as Secretary of Homeland Security.

### Lopez Jr. launches a Government consulting business; first clients are significant Mexican figures

66.     After his resignation in 2011, Defendant Lopez Jr. launched a Government consulting business called Intermestic Partners ("Intermestic").

67.     Plaintiff assisted Defendant with incorporating and establishing Intermestic as a business.

68.     Defendant Lopez Jr.'s consulting business negotiated its first material contract with Grupo Carso, the conglomerate of Mexico's best-known billionaire entrepreneur, Mr. Carlos Slim Helu ("Slim"), with the assistance of Plaintiff.

69.     Lopez Jr.'s consulting business, Intermestic, was successful in

24

obtaining its first material contract with Grupo Carso.

70.     Slim is ranked by leading business publications as one of the
wealthiest individuals in the world.

71.     Slim is often connected by leading media publications with the
political and business interests of a former President of Mexico, Carlos Salinas de
Gortari ("CSG").

**V. Peterson's lawyer, Don Bivens, prepares a lawsuit against a former
business partner of Plaintiff. BURKE reviews and proofreads the lawsuit as it
is filed, at the request of Plaintiff and Attorney Bivens.**

72.     In early 2013, Plaintiff met with BURKE regarding a civil lawsuit that
was being prepared against a previous business partner of Plaintiff.

73.     BURKE agreed to review the civil lawsuit.

74.     Plaintiff delivered copies of the lawsuit to BURKE by electronic
communications, and sent a printed copy of the lawsuit to the office of BURKE in
Washington, D.C., by overnight courier.

75.     In addition to delivering copies of the lawsuit to BURKE, Plaintiff
sent copies of the lawsuit to investors in his previous company, and other parties.

76.     BURKE reviewed the civil lawsuit.

77.     BURKE responded to Plaintiff's Attorney, Don Bivens, ("Bivens")
that he had reviewed the entire lawsuit. BURKE observed to Bivens and to
Plaintiff, inter alia, that the lawsuit was "complete", and "well written."

78.     At the time BURKE reviewed the lawsuit, BURKE had been provided
with a detailed analysis of substantially all pending legal and business matters in
Plaintiff's universe, as of March, 2013, by Plaintiff and Plaintiff's Attorney, Don
Bivens.

79.     Plaintiff relied on BURKE's feedback regarding the lawsuit draft, as a
fundamental part of Plaintiff's decision to authorize attorney Bivens to file the
lawsuit, on March 11, 2018.

### Peterson launches Mobile Corp.; a Trademark License Agreement is authorized by the Mobile Corp. Board of Directors

80.     In early 2013, Plaintiff Peterson organized and launched a new
business, Mobile Corporation ("C1").

81.     BURKE and Lopez Jr. encouraged a mutual friend who was formerly
Lopez Jr.'s superior at CBP, Alan Bersin, ("Bersin") to become an investor in C1.

82.     BURKE and Lopez Jr. told Plaintiff that Bersin would be able to
substantially assist C1, as Bersin was a close colleague of HRC and 42.

83.     Plaintiff noted in media reports that Bersin was, in fact, a close
colleague of HRC and 42.

84.     Lopez Jr. encouraged one of his business partners, Jim Messina,
("Messina") who was formerly the manager of the 2008 Presidential Campaign for
44, to join the Advisory Board of C1.

85.     Lopez Jr. stated to Plaintiff that Messina would be able to

26

substantially assist C1, as Messina was a close colleague of a former President of the United States, referred to throughout this complaint as "44."

86.     Defendants BURKE and Lopez Jr. purchased shares in C1 Corporation and became members of the Board of Directors of Mobile.

87.     Defendant BURKE became the head of the compliance committee for C1.

88.     The principal business office of C1 was established in an office building located at Harvard Square, Cambridge, Massachusetts.

89.     On May 16, 2013, a telephonic Board Meeting for C1 ("the May 16th Board Meeting") was held. During the May 16th Board Meeting, a Trademark License Agreement between C1 and Inter123 ("the TLA") was authorized by the C1 Board of Directors with supervision of inside and outside counsel for C1 and Inter123's Attorneys. Furthermore, the TLA was authorized by the C1 compliance committee.

90.     The Board Meeting was conducted by Attorney Mark Padilla ("Padilla") of the California law firm, Wilson Sonsini, Goodrich & Rosati ("WSGR"), who represented C1 as outside counsel. At the time of the meeting, Padilla was licensed to practice law and was a member of his State Bar, in good standing.

91.     The Board Meeting was attended by Attorney Errol Shifman, general

27

counsel for, among other corporate entities, C1. At the time of the meeting, Shifman was licensed to practice law and was a member of his State Bar, in good standing.

92.     The Board Meeting was attended by outside counsel for Inter123, Attorney Damon Ashcraft ("Ashcraft") of the law firm Snell & Wilmer. At the time of the meeting, Ashcraft was licensed to practice law and was a member of his State Bar, in good standing.

93.     The Board Meeting was attended by Defendant BURKE, who acted, among other roles, in his capacity as a member of the Board of Directors of C1, and as head of the compliance committee of C1. At the time of the meeting, BURKE was licensed to practice law and was a member of his State Bar, in good standing, despite having been previously reprimanded.

94.     At the Board Meeting, the Board of Directors of C1, including Defendants and Lopez Jr., were provided with Terms and Conditions of the TLA (the "T&C's") by Attorneys Shifman and Ashcraft, who were representing C1 and Inter123, acting at the time in their capacities as duly licensed Attorneys.

95.     At the Board Meeting, after considering pertinent discussion and a presentation by Attorneys Shifman and Ashcraft about the T&C's of the TLA, the Board of Directors of C1, including Defendants BURKE and Lopez Jr., voted to authorize the TLA.

28

96.     It was noted by Attorney Shifman, during the vote to authorize the Trademark License Agreement, that C1 Director Peterson had abstained from the vote.

97.     As C1 proceeded to implement its business plans, several rounds of corporate finance activity were completed. (the "Corporate Finance Activity")

98.     Among other persons, Bersin participated in the Corporate Finance Activity.

99.     The Corporate Finance Activity was arranged and supervised by outside counsel for C1, the California law firm of Wilson, Sonsini, Goodrich and Rosati ("WSGR").

100.    In connection with the Corporate Finance Activity, disclosure filings were made by WSGR with State securities regulators.

101.    In connection with the Corporate Finance Activity, disclosure filings were made by WSGR with the United States Securities and Exchange Commission.

102.    At the time the Corporate Finance Activity occurred, Defendant BURKE was the head of the compliance committee for C1.

103.    At the time the Corporate Finance Activity occurred, Defendants BURKE and Lopez Jr. were members of the Board of Directors of C1.

**Lopez Jr. introduces Plaintiff to Emiliano Salinas, the Junior Statesman from Mexico's most influential political family**

29

104.   In early 2014, Plaintiff was introduced by Defendant Lopez Jr. to Emiliano Salinas Occelli ("ESO"), by telephone. Lopez Jr. explained that ESO is the son of the former President of Mexico, Carlos Salinas de Gortari ("CSG").

105.   Shortly thereafter, in early 2014, Plaintiff met with ESO at the Salinas residence in Mexico City (the "Mexico City Meeting")

106.   At the Mexico City Meeting, ESO stated he was the owner of a "Venture Capital" company, Prorsus Capital, that he had interest in technology start-ups, and that in connection with the Corporate Finance Activity of C1, he would invest $50,000 in C1.

107.   Also at the Mexico City Meeting, ESO stated he was involved with a "self-help" organization called Executive Success Programs (hereinafter, "ESP") and suggested Plaintiff should consider joining ESP.

108.   Plaintiff departed the Mexico City Meeting without further discussing ESP.

109.   At the time of the Mexico City meeting, ESO did not disclose to Plaintiff that ESP was the Mexican branch of a group based in the United States, in the State of New York, called NXIVM.[23]

---

[23] See: "Inside the NXIVM Sex Cult's Secret Plot to Take Over Mexico" thedailybeast.com, by Amy Zimmerman. September 09, 2018 4:56 AM ET. "..."The group was composed of Mexico City's elite, wealthiest, high-society types," Oxenberg writes. "The children of four former Presidents of Mexico have been involved with ESP."

110.   Subsequent to the Mexico City meeting, Prorsus Capital invested $50,000 in C1.

## VII. Peterson meets with 42 in Michigan

111.   At the invitation of a political friend of Plaintiff, Michigan Senator Debbie Stabenow, Plaintiff traveled to Detroit, MI, on March 23, 2014, to attend a political event. (the "JJD")

112.   At the JJD, Plaintiff attended a private meeting with a former President of the United States, referenced throughout this complaint as "42."

113.   At the dinner meeting, 42 confirmed to Plaintiff that he was a "good friend" of Lopez Jr.'s former superior at CBP, Alan Bersin.

114.   At the dinner meeting, 42 confirmed to Peterson that he had a long-standing relationship with the Salinas Parties of Mexico.

115.   At the dinner meeting, 42 asked Plaintiff to explain details about how exactly Plaintiff was connected to the Salinas Parties of Mexico. Specifically, 42 asked Plaintiff if he had entered in to any type of "meaningful relationship" with the Salinas parties of Mexico.

---

Emiliano Salinas, the son of former Mexican President Carlos Salinas, reportedly led NXIVM's Mexico branch. According to Executive Success Programs' website, Salinas was a member of ESP's Executive Board since 2009 and co-owned ESP centers in Mexico City, Guadalajara and Los Angeles.

... From what I heard from high-ranking defectors, the supposed plan was to get Emi into office in Mexico's next Presidential election in the summer of 2018 so that a top-ranking Espian and Nxivm devotee would have power on the world's political stage. His father, Carlos, would use his Machiavellian methods to ensure his son's election win."

31

116.   Plaintiff responded to 42 that although he was involved in a business relationship with Bersin, he had not entered in to what he considered would be a "meaningful relationship" with the Salinas parties of Mexico.

### Lopez Jr. threatens Plaintiff Jeffrey Peterson

117.   Subsequent to the Mexico City meeting, Plaintiff attended a social event at the residence of Lopez Jr., near Washington D.C., which was also attended by Defendant Barr.

118.   During the social event, Peterson noted Defendants Barr and Lopez Jr. spoke about "close contacts" each had maintained within U.S. Federal Government agencies such as the Department of Homeland Security, since their respective resignations subsequent to BURKE's resignation due to the Fast and Furious arms trafficking scandal under 44.

119.   During the social event, Peterson noted Defendants Barr and Lopez Jr. spoke, among other things, about their abilities to order such "close contacts" within Government agencies captioned by paragraph 118 above, to "expedite visas" for foreign nationals.

120.   During the social event, Peterson noted Defendant Lopez Jr. was speaking with ESO on Lopez Jr.'s mobile phone.

121.   During the social event, Peterson observed when Defendant Lopez Jr. was speaking with ESO on Lopez Jr.'s mobile phone, Lopez Jr. had mentioned

32

Bersin.

122.   Bersin had previously served as Lopez Jr's superior at the United States Department of Customs and Border Protection, as Commissioner, under JN and 44.

123.   When Plaintiff asked Lopez Jr. about Lopez Jr.'s conversation with ESO, Lopez Jr. threatened Plaintiff. Lopez Jr. stated that if Plaintiff were to disclose the fact to any third party that Lopez Jr. was working with Bersin, ESO and/or the Salinas Parties of Mexico, "they [the Salinas Parties]," would "kill your entire family," ... "then kill you."

124.   After Lopez Jr. made the threats described above, Plaintiff departed the social event, and proceeded to distance himself from Defendants Lopez Jr. and BURKE.

125.   The threats described above, made by Lopez Jr. to Plaintiff, caused Plaintiff significant emotional distress and other harm.

**The Arizona Republic, who Burke had previously stated he had "in his pocket," provides favorable press coverage of Burke; a Member of congress criticizes BURKE with respect to BURKE's retaliation against a Fast and Furious whistle-blower.**

126.   On March 28, 2014, with respect to the Fast and Furious weapons trafficking scandal, the "editorial board" of the *Arizona Republic* published an article titled "Dennis Burke should've been celebrated, not sanctioned" (the "March 28, 2014 Article")

33

127.  In the March 28, 2014 Article, the "editorial board" of the *Arizona Republic* tended to defend BURKE, on the one hand, while making certain observations.

128.  According to the "editorial board" in the March 28, 2014 Article, with respect to BURKE's actions throughout the Fast and Furious arms trafficking scandal, BURKE "attempted to deceive ... the American people."

129.  On April 1, 2014, the *USA TODAY* published an article critical of BURKE, titled "Bar findings questioned in Fast and Furious reprimand" (the "April 1, 2014 Article")

130.  In the April 1, 2014 Article, a member of the United States Congress, Rep. Darrell Issa, R-Calif., stated, "His [BURKE's] actions to selectively leak a single document supporting a misleading narrative ... was a cowardly and self-serving action intended to smear a whistle-blower ... I'm deeply troubled to see him describe, and have the state Bar apparently accept at face value, the idea that his effort to retaliate against a Fast and Furious whistle-blower was intended as an act of 'transparency.'"

**The ACC sues certain parties, naming Peterson as a Defendant by virtue of "control ownership"; inaccurate, defamatory statements are made by Lopez Jr. and BURKE to certain parties, among other reasons, possibly to induce the ACC.**

131.  On June 30, 2015, the ACC filed a Notice of Opportunity for Hearing Regarding Proposed Order to Cease and Desist against LoanGo Corporation

34

("C2"), Justin Billingsley, John Ayers, and Jeffrey Peterson, (the "2015 ACC Action") alleging violations of the Arizona Securities Act.

132.   The ACC has been characterized as a State agency in Arizona that has faced challenges in the media due to possible corruption.

133.   The former Director of the ACC was investigated by the FBI and indicted in a case where he was accused of taking bribes.

134.   The internal Docket No. of the 2015 ACC Action at the ACC was S-20932A-15-0220.

135.   C2 was a company in which Plaintiff had, years prior, owned a percentage ownership, through his Nevada corporation, Inter123.

136.   At the time the 2015 ACC Action was filed, BURKE had previous knowledge about Plaintiff's ownership in C2, among other reasons, due to BURKE's previous assistance of Plaintiff with the 2013 Complaint.

137.   At the time the 2015 ACC Action was filed, C2 was defunct, having been previously taken over by a different management group. Plaintiff had not been made aware of complaints with respect to C2; Plaintiff had not heard about C2 for years.

138.   On information and belief, Plaintiff's only financial involvement with C2 was making a $10,000 loan from Plaintiff's personal funds, to C2, to pay legal fees in order for C2 to prepare a lengthy disclosure document so as to comply with

35

applicable laws and regulations.

139.   On information and belief, Plaintiff had no other financial connection to C2, except the $10,000 loan Plaintiff made to C2, captioned in paragraph 138 above.

140.   Plaintiff was named as a Defendant in the 2015 ACC action by virtue of ownership in C2 by a company associated with Plaintiff.

141.   In 2015 and 2016, Plaintiff spoke with numerous persons who stated Defendant Lopez Jr. had made inaccurate, defamatory statements about Plaintiff.

142.   For example, in 2016, Plaintiff spoke with the mayor of Phoenix, Arizona, Greg Stanton ("GS"), who stated Lopez Jr. had made inaccurate, defamatory statements about Plaintiff to persons in Arizona and persons associated with the DNC.

143.   In 2015 and 2016, Plaintiff spoke with numerous persons who stated Defendant BURKE had made inaccurate, defamatory statements about Plaintiff.

144.   For example, in October of 2016, Plaintiff travelled from his residence in Boston, Massachusetts to Phoenix, Arizona, where Plaintiff spoke with a senior Democratic Party Operative, Chelsea Clinton ("CC"). At the time, CC told Plaintiff Peterson that Defendant BURKE had made inaccurate, defamatory statements about Plaintiff to significant persons including persons in Arizona and persons associated with the DNC.

36

**BURKE makes threats; BURKE continues making defamatory statements
about Plaintiff**

145.  In early 2017, BURKE continued sending questions to Plaintiff
regarding the C1 business.

146.  Plaintiff thought the questions emerging from BURKE in early 2017
were peculiar, because BURKE, in his previous role as head of the compliance
committee for C1, and member of the Board of Directors of C1, already knew the
answers to questions he asked Plaintiff in early 2017 regarding C1.

147.  For example, in early 2017, BURKE sent a question to Plaintiff by
electronic communications, in which BURKE asked Plaintiff, "What is Inter123?"

148.  At the time BURKE asked, "What is Inter123," BURKE already what
Inter123 was, and had known about Inter123 since at least ten years prior.

149.  Peterson felt BURKE was asking questions of which he already knew
the answers, part of an attempt by BURKE to create the appearance of doubt and
suspicion regarding the past business dealings of C1.

150.  Throughout early to mid 2017, Defendant BURKE sent numerous
bizarre, ambiguously threatening messages to Plaintiff through electronic
communications.

151.  In a sinister, ambiguously threatening text message, BURKE stated to
Plaintiff, "You are a smart guy, right?"

152.  When BURKE threatened Plaintiff as described by the paragraphs

37

above, Plaintiff, recalling threats previously made by Lopez Jr. described under section VII of this Complaint, and for other reasons, felt threatened by BURKE.

153.  BURKE stated in a message to Plaintiff, that BURKE "would not have grounds " ... "to sue [Plaintiff] civilly."

154.  BURKE stated in communications with Plaintiff, that BURKE would leverage his contacts within the Government to cause what were, in BURKE's mind, unresolved business issues, to become a "criminal" matter.

155.  The threats described above, made by BURKE to Plaintiff, caused Plaintiff significant emotional distress and other harm.

### BURKE, threatening "prosecution", harasses Plaintiff and Plaintiff's business partner; Plaintiff cautions BURKE; Son of Plaintiff's business partner overdoses resulting in death

156.  On or abut June of 2017, in the email message sent to BURKE by Plaintiff, Plaintiff observed to BURKE, that BURKE's threats of criminal prosecution against Plaintiff and Plaintiff's business partner, were causing "unrest" in the home of Plaintiff's business partner.

157.  In a email message to BURKE, Plaintiff encouraged BURKE to stop making veiled threats of criminal prosecution against Plaintiff's business partner, Michael Silberman ("Silberman") and that if BURKE needed to make such threats, it would be Plaintiff's preference that BURKE apply such pressure only Plaintiff, not Silberman.

38

158.   BURKE continued insinuating that Plaintiff and Plaintiff's business partner, Michael Silberman, would be somehow subjected to "criminal" prosecution, possibly by BURKE himself, in some way that Plaintiff and his business partner did not understand.

159.   On June 30, 2017, it was announced that the son of Plaintiff's business partner, Maximillian Silberman, had deceased, due to a drug overdose.

160.   Plaintiff sent an email message to BURKE, in which Plaintiff observed to BURKE, that BURKE's veiled threats had contributed to unrest in the household of Plaintiff's business partner, and that Plaintiff's business partner had deceased, due to a drug overdose.

161.   BURKE did not show compassion or caring about the death of Maximillian Silberman to Plaintiff. Instead, BURKE replied to Plaintiff that Plaintiff's message was "sick."

162.   The series of events and threats described above, made by BURKE to Plaintiff and in some cases, to Plaintiff's business partner, caused Plaintiff significant emotional distress and other harm.

163.   The series of events leading to the death of the son of Plaintiff's business partner, and the death of Plaintiff's business partner as described within paragraphs 156 to 161 above, caused Plaintiff significant emotional distress and other harm.

39

**Peterson disengages from BURKE, hires legal counsel in Boston and Phoenix; BURKE, attempting to improperly create the appearance of "criminal" circumstances, spreads rumors Plaintiff had "fled"**

164.   In light of Defendant BURKE's bizarre behavior, in which BURKE, among other things, asked Peterson questions of which BURKE already knew the answers, and BURKE insinuated that Plaintiff and/or his business partner would be subject to "prosecution" for reasons Plaintiff did not understand, Plaintiff was advised by an Attorney friend it would be wise to stop speaking with BURKE, and that Plaintiff should hire legal counsel to speak with BURKE on Plaintiff's behalf.

165.   Plaintiff ceased communications with BURKE, and retained legal counsel in Boston, Massachusetts (the "Massachusetts counsel") for the purpose of analyzing bizarre behavior and threats made by BURKE.

166.   In a series of lengthy meetings held at the Suffolk County courthouse, Plaintiff poured over records of communications with BURKE, together with his Massachusetts counsel, attempting to understand threats made by BURKE and the circumstances of the Retaliatory Campaign.

167.   Furthermore, Plaintiff traveled from his home in Belmont, Massachusetts, to Phoenix Arizona, to retain legal counsel in Arizona for the purpose of communicating with BURKE on his behalf.

168.   In Arizona, Plaintiff retained the law firm of Ryan Rapp & Underwood, lawyers Andrew Pacheco and Chris Rapp, (the "Arizona Attorneys")

40

to communicate with BURKE on Plaintiff's behalf.

169.   Shortly thereafter, Plaintiff's Arizona Attorneys met with BURKE.

170.   After the meeting, Plaintiff's Arizona Attorneys informed Plaintiff that

BURKE had acted "strange" and "highly agitated" during the meeting, that

BURKE stated Plaintiff was "going to prison," for reasons BURKE could not

substantiate. Plaintiff's Arizona Attorneys further observed they were unable to

understand BURKE's reasoning during the meeting.

**the Oct. 23, 2017 *Arizona Republic* Articles; intentional mischaracterizations
published by a highly motivated journalist who takes the extraordinary step
of covering the same story twice in the same day**

171.   On October 23, 2017, during the relevant time period of the

Retaliatory Campaign, the *Arizona Republic* published a news article authored by

Defendant Harris, with the title "State orders failed internet payday loan venture to

pay $250K to defrauded investors" (the "October 23 Article"). Defendant Harris

enthusiastically covered the same story twice in one day.

172.   The October 23 Article contained intentional mischaracterizations,

inaccuracies and other defamatory statements about Plaintiff pertaining to the 2015

ACC matter. Such harmful statements were knowingly authored by Defendant

Harris acting in concert with Defendants BURKE, Lopez Jr. and other persons who

knew, collectively as a group, certain statements were not true. Therefore, it is the

argument of Plaintiff that the October 23 Article was conceptualized and authored

41

with actual malice.

173.   For example, the third paragraph of the October 23 Article stated, "Peterson is a former Arizona-Mexico Commission member, major donor to Arizona Democratic candidates, and founder of Quepasa, a now-defunct *(sic)* Latino online social-media outlet."

174.   The statement in the October 23 Article that Plaintiff "is a ... founder of Quepasa, a now-defunct Latino online social-media outlet" was a incorrect and defamatory statement because, among other reasons, the Social Media business founded by Peterson originally known as Quepasa, is not defunct.

175.   The technology business Plaintiff is best known for founding, QUEPASA COM INC., operated continuously for approximately ten years before merging and later changing its corporate name in 2012 to MeetMe Inc. ("MeetMe") and in 2017 to The Meet Group, Inc. ("TMG"). The surviving company is still engaged in the Social Media business and still publicly listed on the Nasdaq Stock Market.

176.   TMG continues registered with the same SEC filer number today as QUEPASA COM INC., the company founded by Plaintiff in 1998 and incorrectly characterized by the defamatory *Arizona Republic* newspaper article referenced in paragraph 173 above.

177.   The Social Media business founded by Plaintiff Jeffrey Peterson, first

42

known as Quepasa.com, Inc., now known as TMG, is not defunct, as was reported by Defendant Harris in the *Arizona Republic* article.

178.   According to documents recently filed with the SEC, TMG, previously known as QUEPASA COM INC., now operates the well-known Internet brands, MeetMe®, LOVOO®, Skout®, and Tagged®, collectively serving a total of 4.87 million active users per day ("DAUs"), with third quarter 2018 revenues of $45.7 million, an increase from revenue of $32.2 million in Q3 of the prior year. Nine-month revenues for the period ending September 30, 2018, were $126,155,591, or approximately $126 million dollars.

179.   Defendants Harris, Phoenix Newspapers, and Gannett Co. Inc., knew the statement characterized in paragraph 163 above, that Plaintiff "is a ... founder of Quepasa, a now-defunct Latino online social-media outlet" was not true because, among other reasons, the Arizona Republic itself previously published numerous news articles about Quepasa's corporate history, including articles that followed Quepasa through its lengthy corporate history, including an article reporting that investor Richard L. Scott had joined Quepasa's shareholder group in 2006.

### the Dec. 14, 2017 *Arizona Republic* Article; continued attempts to criminalize Plaintiff and the "hope" of bringing additional investigations

180.   On December 14, 2017, the Arizona Republic published a news article titled "Ex-Quepasa head Jeff Peterson faces questions about investors' money" (the

"December 14 Article").

181.   The December 14 Article was intended by BURKE, Harris and others, who knowingly acted in concert, to create the appearance a *crime* had occurred; that Plaintiff was *very bad person;* ultimately, as suggested by the December 14 Article, a *criminal*, which has been, ultimately, the long-term objective of the Retaliatory Campaign: to improperly, unfairly, by force, create the *sinister appearance* of wrongs, with the hope of drawing the attention of Government or law enforcement agencies, and somehow, through any means, *criminalize* the Plaintiff for the benefit of BURKE and the AZM Defendants as they seek to silence Plaintiff's public voice for their benefit.

182.   In the December 14 Article, numerous inaccurate, untrue statements were made by one or more Defendants in an attempt to vilify Plaintiff, who was, to the best of his knowledge, not "facing questions" ... "from investors" as suggested contextually by the December 14 Article.

183.   In the December 14 Article, Defendant BURKE stated, inter alia, that he "was unaware of the [C2] private placement offering until October 2017." BURKE then invoked two of the best-known *criminal thieves* in American History, by stating, "It's like mentioning Bonnie but not Clyde. *(sic)*"

184.   The December 14 Article stated, "Marco Lopez, no longer a Mobile board member, said *(sic)* Peterson has a lot of explaining to do." Furthermore,

44

Lopez Jr. stated, with respect to the TLA described in paragraph 88 of this

Complaint, "There was never any mention of money. *(sic)*"

185.   In the December 14 Article, Defendant Diaz stated, inter alia,

"[Peterson] is playing catch-me-if-you-can. A lot of the stuff he (Peterson) did was

to open up doors to others ... *but he burned us all.*"

186.   In the December 14 Article, Defendant David Lopez stated, inter alia,

"...I thought I could help. After a while, I realized we were being snookered. "

187.   Contrary to statements made by Lopez Jr. and BURKE throughout the

December 14 Article, including the statement by Lopez Jr. that "There was never

any mention of money," Lopez Jr. was well aware the T&C's of the C1 TLA

included financial terms. As described by paragraph 58 of this Complaint,

Defendants BURKE and Lopez Jr. previously served as directors of C1 and

authorized the TLA themselves on May 16, 2013, at a telephonic meeting of the

Board of Directors of C1 conducted by outside counsel (Attorney Padilla of

WSGR), the General Counsel of C1 and counsel for Inter123. At the May 13, 2013

Board Meeting, BURKE and Lopez Jr. voted to authorize the TLA after

considering T&C's of the TLA, explained during the meeting by Attorneys

Shifman and Ashcraft, who were representing C1 and Inter123 respectively in their

capacities as duly licensed Attorneys. Furthermore, Defendant BURKE had been

provided with comprehensive disclosures about Plaintiff's previous business

45

activities prior to such time as C1 was conceptualized and subsequently launched as a start-up company, including disclosures pertaining to C2 contained in a legal document prepared by Plaintiff's Attorney, Don Bivens, as described in paragraphs 72 to 78 of this complaint and on other occasions. As chief of compliance for C1, it was the duty of BURKE, a licensed Attorney himself, to be familiar with material company contracts pertaining to C1. Importantly, Lopez Jr. was provided with many of the same disclosures as BURKE and at the time Lopez Jr. voted to authorize the TLA as a member of the C1 Board of Directors, Lopez Jr. was equally or even more aware of Plaintiff's activities by virtue of years of business dealings with Plaintiff and Lopez Jr.'s years of close friendship with Plaintiff.

188.   Defendant Diaz knew the statements he made in the December 14 Article were false, because, among other reasons, he had previously served on the Board of Directors of the subject company and while doing so, Diaz authorized transactions himself.

189.   Defendant Diaz knew his statements were false, because, among other reasons, as he had constantly been connected with Plaintiff on social media sites such as Facebook, and never so much as attempted to contact Plaintiff during the subject time period.

190.   Defendant David Lopez knew the statements he made in the December 14 Article were false, because, among other reasons, he had previously

46

served on the Board of Directors of the subject company and while doing so,

Lopez reviewed business decisions and authorized transactions himself.

191.   Furthermore, Defendant David Lopez knew the statements he made in

the December 14 Article were false, as Plaintiff had previously entered in to one or

more business transactions with a business owned by his daughter, well-known

actress Jennifer Lopez, while Plaintiff was Chief Executive Officer of the original

company founded by Plaintiff, referred to throughout this Complaint as Quepasa.

192.   Cooperating with the spirit of Defendant BURKE's improper attacks

against Plaintiff insofar as one of the primary objectives of the Retaliatory

Campaign has been a persistent attempt by BURKE to vilify and ultimately

*criminalize* Plaintiff through any available means, Defendant Harris, acting in

concert with BURKE and others, authored the following statement at the

conclusion of the December 14 Article: "Investors and some board members plan

to turn over the various companies' internal documents, including bank records, *to

law enforcement,* the Corporation Commission ... and the IRS in *hopes* of bringing

additional investigations."

193.   Subsequent to publication of the December 14 Article, Plaintiff's

Attorneys were contacted by staff of the ACC, who requested numerous

documents from Plaintiff's Attorneys pertaining to C1.

194.   Plaintiff delivered the requested documents to the ACC staff, as

47

requested by the ACC.

195.   Subsequent to publication of the December 14 Article, Plaintiff's business partner received numerous notices that documents had been subpoenaed by staff of the ACC.

### NXIVM Cult leader arrested in Mexico; BURKE proceeds to provide legal services to heiress financier of the Cult

196.   On March 27, 2018, the leader of a "Cult" group known as NXIVM, the same group which ESO had invited Plaintiff to join several years prior, as described by paragraphs 103 to 109 of this Complaint, was arrested in Mexico.

197.   The individual arrested in the NXIVM case is known by the alias, "The Vanguard."

198.   The Government's lawsuit, filed 02/14/2018, accuses "The Vanguard" and others, among other things, of human trafficking, immigration violations, and intimidation, through forceful methods, including Abusive Litigation.

199.   One of the defendants in the NXIVM matter is Clare Bronfman, ("Bronfman") a well-known heiress to the Seagram's liquor fortune.

200.   According to media reports, Bronfman has contributed significant financial resources in connection with the NXIVM organization, of $100 million or more.

201.   According to reports in the United States and Mexican media, one of the key personalities associated with the NXIVM organization is ESO, who

48

previously suggested to Plaintiff that Plaintiff should join his NXIVM-affiliated

organization, in 2014, as described by paragraphs 103 to 108 of this complaint.

202.   In July of 2018, Plaintiff was interviewed regarding BURKE.

203.   The individual conducting the interview was a licensed Attorney. The

Attorney stated he was acting as a liaison between the FBI and victims in the

NXIVM Cult case.

204.   The Attorney who conducted the interview told Peterson the

following things about BURKE:

(a) That BURKE had made phone calls to witnesses in the NXIVM

scandal to intimidate and coerce them;

(b) That BURKE has provided services, including legal services, to

Bronfman, in connection with the NXIVM matter;

(c) That BURKE was working "behind the scenes" to coordinate

activities of multiple Attorneys and Defendants in connection with the NXIVM

matter.

**Plaintiff attempts to speak with the press; BURKE, in furtherance of the
Retaliatory Campaign, suppresses Peterson's attempts to speak**

205.   In August of 2018, Plaintiff was interviewed by a news reporter with

the Sun U.K. news organization.

206.   Immediately After Plaintiff was interviewed, BURKE contacted the

SUN U.K. reporter, threatening legal action. BURKE, on information and belief,

sent a "Cease and Desist" letter to the SUN U.K. reporter. Furthermore, BURKE, acting to block Plaintiff's truthful depictions of historical events, stated to the reporter, "You're being *'duped'* by Peterson *(sic)*", without further explanation.

207.   When BURKE contacted the SUN U.K. reporter, BURKE made inaccurate, Defamatory statements about Plaintiff.

208.   After BURKE made inaccurate, Defamatory statements about Plaintiff, the SUN U.K. declined to run the previously planned story about Plaintiff.

## BURKE, in furtherance of the Retaliatory Campaign, plants manufactured text for future citation within court documents in Delaware

209.   In September of 2018, BURKE contacted a lawyer in Philadelphia, PA (hereinafter referred to as "WM") who was preparing a civil lawsuit against an individual previously known to both BURKE and Plaintiff (hereinafter, "JB").

210.   On information and belief, BURKE made defamatory, intentionally misleading statements to WM about Plaintiff.

211.   On information and belief, BURKE encouraged the lawyer to include such inaccurate depictions described by paragraph 193 above with respect Plaintiff's character and historical conduct in a civil complaint WM was drafting at the time against JB (the "Delaware lawsuit").

212.   In doing so, BURKE acted fraudulently and with an evil mind to coerce WM that, as a fellow Attorney, BURKE could be trusted, and WM should

take BURKE at his word with respect to Plaintiff's character and alleged past business conduct. As a result of coercion by BURKE and WM's reliance on BURKE's defamatory statements regarding Plaintiff's character and usual business practices, inaccurate depictions of Plaintiff's character and past business activities were included within the text of official court documents filed as part of WM's Delaware lawsuit against JB. Conveniently to BURKE, such inaccurate depictions of Plaintiff's character and past business activities, manufactured by BURKE and included in the Delaware lawsuit as a result of BURKE's coercion of a fellow Attorney, tend to justify the inaccurate, untruthful statements made by BURKE throughout the Retaliatory Campaign, and are now available for citation by BURKE from within the official court docket of the Delaware lawsuit.

213.   On information and belief, BURKE did not disclose to WM that BURKE was involved in his own dispute between prior business partners involving Plaintiff.

214.   On information and belief, BURKE did not disclose to WM that inaccurate depictions of Plaintiff's character and past business activities about Plaintiff would tend to justify the Retaliatory Campaign BURKE had orchestrated against Plaintiff, to the extent such inaccurate depictions of Plaintiff's character and past business activities would then be available for citation by BURKE in future legal proceedings from official court documents.

51

215.   On information and belief, BURKE did not disclose to WM that BURKE had been previously sanctioned by his Bar association.

216.   In September of 2018, Plaintiff was contacted by Defendant FLORES.

217.   Defendant FLORES encouraged Plaintiff to speak with him by phone.

218.   Defendant FLORES stated that he didn't care if Plaintiff recorded their telephonic conversation.

219.   When Plaintiff spoke with Defendant Flores by phone, Flores overtly stated to Plaintiff that Flores knew people in Phoenix, Arizona, who were capable of murdering Plaintiff.

220.   Threats made by Defendants Lopez Jr., BURKE, and FLORES, were discussed, coordinated and enacted by said parties together as a group effort in furtherance of the Retaliatory Campaign.

221.   As previously described in this Complaint, Defendants Lopez Jr., BURKE, and FLORES, and certain other persons are known for participating in a social and political group related to former United States Homeland Security Secretary Janet NAPOLITANO (referred to throughout this Complaint as "JN"), a group characterized by the *Arizona Capitol Times* newspaper as the "Arizona Mafia".[24]

---

[24] "Napolitano's years at Homeland Security pay dividends for 'Arizona Mafia'", Arizona Capitol Times, by Jeremy Duda, July 19, 2013. "Being part of the massive entourage that Janet Napolitano brought with her from Arizona to the Beltway has been a great career move for some of her loyalists."

## CLAIMS OF PLAINTIFF JEFFREY PETERSON

### Count One
### (Defamation - against all Defendants)

222.   Peterson repeats, realleges and incorporates the allegations made in paragraphs 1 through 201 as if fully set forth herein.

223.   Defendants made defamatory statements regarding Peterson.

224.   Defamatory statements made by defendants were false and Defendants knew they were false when made.

225.   Defendants have communicated these defamatory statements to various third parties.

226.   When Defamatory statements were made regarding Peterson, Defendants acted with actual malice.

227. As a result of Defendants actions and conduct, Peterson sustained damages in an amount to be determined at trial.

### Count Two
### (Intentional infliction of Emotional Distress - against BURKE, Marco A. Lopez, Jr., Luis Borbon Holguin, Victor Flores and Mario E. Diaz)

228.   Plaintiff restates and re-alleges all preceding allegations as if fully recited herein.

229.   Certain Defendant engaged in conduct that is extreme and outrageous.

53

230.   Certain Defendants knew that Plaintiff would be susceptible to the emotional distress caused by their conduct.

231.   Certain defendants had no legitimate business purpose for their conduct. The conduct described by this Count Two was intentional and/or reckless.

232.   As a result of the actions and conduct of certain Defendants, Plaintiff sustained damages in an amount to be proven at trial.

233.   The acts alleged above as committed by certain Defendants were committed intentionally and with an evil mind, therefore the award of punitive damages is allowed under Massachusetts law.

## Count Three
### (Tortious Interference with a Contract against Burke and Borbon Holguin)

234.   Plaintiff restates and re-alleges all preceding allegations as if fully recited herein.

235.   Plaintiff had significant contractual relationships with with Lopez Jr. and other parties.

236.   Defendants BURKE and Luis Borbon Holguin improperly interfered with Plaintiff's contractual relations with Lopez Jr. and other parties.

237.   This interference caused Plaintiff harm both monetarily and to his reputation.

## Count Four
### (Tortious Interference with Business Relations against Borbon Holguin, Barr

54

**and Diaz)**

238.   Plaintiff restates and re-alleges all preceding allegations as if fully recited herein.

239.   Plaintiff had significant business relationships with Lopez Jr. and other parties.

240.   Defendants BURKE and Luis Borbon Holguin improperly interfered with Plaintiff's business relationships with Lopez Jr. and other parties.

241.   This interference caused Plaintiff harm both monetarily and to his reputation.

## Count Five
### (Retaliation - against all Defendants)

242.   Plaintiff restates and re-alleges all preceding allegations as if fully recited herein.

243.   Retaliation is present when a plaintiff shows that he engaged in protected conduct, he suffered an adverse action, and a causal connection existed between the conduct and the adverse action. Mole v. University of Massachusetts, 442 Mass. 582, 591 (2004).

244.   If any person, employer, labor organization or employment agency discharges, expels or otherwise discriminates against any person because he has opposed any practices forbidden under this chapter or because she has filed a

complaint, testified or assisted in any proceeding, they are in violation of M.G.L. c. 151B. M.G.L. c. 151B s. 4 (4).

245.   As described throughout this complaint, Plaintiff opposed the practices of Burke, Lopez Jr., and others in connection with the Salinas parties of Mexico and other things, and was retaliated against as a result.

246.   Defendants improperly interfered with Plaintiff's business, contractual relationships, and engaged in intentional acts to harm Plaintiff, as described throughout this Complaint.

247.   This interference caused Plaintiff harm both monetarily and to his reputation. Furthermore, the Retaliation caused Plaintiff, among other problems, severe emotional distress, embarrassment, and the loss of enjoyment of his life.

**Count Six**
**(Breach of Fiduciary Duty against BURKE, Lopez Jr., Diaz, and David Lopez)**

248.   Peterson repeats, realleges and incorporates the allegations made in paragraphs 1 through 45 as if fully set forth herein.

249.   Defendants have committed various torts against Peterson that have caused injury;

250.   Barr and Diaz knew that Defendants conduct was tortious; and

251. Barr and Diaz substantially encouraged and assisted Defendants in the achievement of the torts against Peterson.

56

## Count Seven
### (Civil Conspiracy against BURKE, Lopez Jr., Luis Borbon Holguin, Diaz, Barr, Harris, David Lopez)

252.   Peterson repeats, realleges and incorporates the allegations made in paragraphs 1 through 45 as if fully set forth herein.

253.   Defendants agreed to commit tortious acts against Peterson.

254.   The agreement to commit tortious acts against Peterson constitutes an agreement to accomplish an unlawful purpose.

255.   Defendants took steps to accomplish that unlawful purpose.

256.   As a result of the agreement among Defendants, Peterson has been injured in an amount to be proven at trial.

## Count Eight
### (Multiple Damages)

257.   Plaintiff repeats, realleges and incorporates the allegations made in paragraphs 1 through 256 as if fully set forth herein.

258.   The tortious acts alleged above as committed by Defendants were committed intentionally and with the requisite evil mind to permit the award of multiple damages.

## Count Nine
### (Punitive Damages)

259.   Plaintiff repeats, realleges and incorporates the allegations made in

paragraphs 1 through 258 as if fully set forth herein.

260.   The tortious acts alleged above as committed by Defendants were committed intentionally and with the requisite evil mind to permit the award of punitive damages.

## RESERVATION OF RIGHTS

261.   Petitioner(s) hereby explicitly reserve(s) his fundamental Right(s) to amend this and all subsequent pleadings, should future events and/or discoveries prove that he has failed adequately to comprehend the full extent of the damage(s) which he suffered at the hands of the Respondents, and other involved parties, both named and unnamed, now and at all times in the future. *See* Rules 8, 15, and 18 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a) As to all Counts, awarding Peterson damages in amounts to be determined at trial;

(b) Award compensatory damages for physical illness, physical and emotional pain and suffering, emotional distress, humiliation, anxiety, embarrassment, reputational damages, loss of enjoyment of life and out-of-pocket expenses or other financial losses;

(c) Award multiple damages pursuant to G.L. c. 151B §9;

(d) Award punitive damages pursuant to G.L. c. 151B §9 in an amount not less than One Hundred Million Dollars;

(e) Award Plaintiff court costs, expenses and reasonable legal fees in connection with this complaint;

(f) Award pre-judgment and post-judgment interest at the highest rate(s) provided by law;

(g) An injunction prohibiting Defendants from making defamatory statements about Plaintiff, to cease the Retaliatory Campaign against Plaintiff, to cease interference with Plaintiff's media communications, and to cease attempts by Defendants BURKE, Lopez Jr., and affiliated persons to have colleagues shut

down Plaintiff's Social Media accounts; and

(h) Award Plaintiff such other and further relief, at law and in equity as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

**Respectfully submitted,**
**Plaintiff,**

**Jeffrey Peterson**
Plaintiff Pro Se
6 Liberty Square #340
Boston, MA 02109
Phone: (617) 500-4980
Fax: (617) 804-0441
Dated: December 11, 2018     legal@jeffreypeterson.com

60